Cite as 2023 Ark. App. 313

# ARKANSAS COURT OF APPEALS
DIVISION I
**No.** CR-22-341

| | |
|---|---|
| NAHAMAN SOLORES CASTILLO<br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br>APPELLEE | **Opinion Delivered** May 31, 2023<br><br>APPEAL FROM THE CONWAY COUNTY CIRCUIT COURT<br>[NO. 15CR-19-243]<br><br>HONORABLE JERRY DON RAMEY, JUDGE<br><br>AFFIRMED |

## BRANDON J. HARRISON, Chief Judge

A Conway County jury convicted Nahaman Castillo on one count of fourth-degree sexual assault, a Class A misdemeanor. Ark. Code Ann. § 5-14-127(a)(1)(B) & (b)(2) (Supp. 2021). The jury found him guilty of having sexual contact with his minor daughter in June 2019 while her mother Isyurai Martinez was at work. The jury acquitted him of second-degree sexual assault for that incident; it also acquitted on second-degree and fourth-degree sexual-assault charges brought on a different alleged incident. Castillo was sentenced, at the jury's recommendation, to twelve months' probation and no fine.

Castillo appeals from the circuit court's denial of two motions for mistrial. That is never an easy lift for the appellant: a mistrial is a drastic remedy that should be declared only when there has been an error so prejudicial that justice cannot be served by continuing the trial or when it cannot be cured by an instruction. *Halliburton v. State*, 2020 Ark. 101, at 18, 594 S.W.3d 856, 867. The decision lies within the sound discretion of the circuit court,

and we do not disturb it unless an abuse of discretion or manifest prejudice to the complaining party is shown. *Barnum v. State*, 2020 Ark. App. 523, 614 S.W.3d 453.

The first mistrial motion involved what Castillo says was an improper reference to his immigration status. Neither Castillo nor Martinez was lawfully present in this country. Before trial, Castillo moved to exclude references to his immigration status. The prosecutor responded, "I didn't have any intention of mentioning that." The court replied, "Okay." And indeed, the State did not mention Castillo's immigration status in its case-in-chief.

But Castillo decided to testify. In anticipation of his testimony, the defense called Mike Miller—who owned the restaurant in Morrilton where Castillo worked—to testify to Castillo's reputation for truthfulness. Miller said he thought Castillo was a truthful person. On cross-examination, the prosecution asked, "Has [Castillo] ever told you whether or not he's illegally in the United States or not." Miller answered, "Yes, sir." The prosecutor asked, "What did he tell you?"

Defense counsel then moved for a mistrial, arguing that a court order barred that inquiry, and the testimony was prejudicial. The State said the questions could be relevant to Miller's credibility if, for example, Miller had been employing and paying someone he knew could not legally work. The court denied the motion for mistrial. It found the defense opened the door to the question by eliciting testimony on Castillo's truthfulness. But it ordered the prosecutor to ask no more questions on the subject. Defense counsel did not ask for a jury admonition, and none was given.

We affirm the denial of the first motion for mistrial. By that point in the trial, the family's uncertain immigration status was already known. For example, the victim's

2

therapist Rebekah Pevia testified that in their sessions, the victim initially admitted the sexual abuse, then said she had lied about it, but admitted it again later. According to Pevia, the victim had briefly recanted because "she was told that her mom would be sent out of the country, and that she and her siblings would be put in foster care." Castillo's mother testified that she had asked him about the abuse allegations. She said he had denied them, and had said further, "So, you think if I had done it that I would still be here? I would have gone back to my country."

Strictly speaking, those exchanges did not establish that Castillo *himself* was present illegally. But the State did not establish that either. The circuit court cut off inquiry before the State had done more than raise the possibility that Castillo might not have had legal status. Even after the mistrial ruling, Miller volunteered that Castillo was "worried about what's going to happen to him," and "[h]e's lived here for 20-some years." In any event, we find no error on the first point and affirm.

The second mistrial motion centered on the prosecution's statements in closing argument about Willerene Guinn, a former employer of Castillo's who remained close. One business day before the 4 October 2021 trial, the prosecution turned over audio from phone calls recorded in September and November 2020 in which (we infer) Guinn seemed to relate to a friend that Castillo had told her he had touched the victim inappropriately and felt bad about it. The prosecutor advised that he intended to call Guinn as a witness and play the recording if she didn't testify right. Defense counsel moved to exclude the evidence or, in the alternative, continue the trial.

3

To give the defense time to investigate, the court excluded all mention of Guinn or those matters the first day, a Monday. When trial resumed the following Wednesday, the prosecutor indicated, "I don't intend on calling Ms. Guinn in my case in chief. I reserve the right to possibly call her in rebut[tal], but that certainly depends on any witnesses they would call and whether it would necessary."

Neither side called Guinn in its case-in-chief. The prosecution laid no foundation to introduce Castillo's alleged statements to Guinn through other witnesses. But the prosecution asked about them anyway. For example, the State elicited from Castillo's character witness Mike Miller that he had bought his restaurant from "Jim and Eng Guinn." Miller testified that Guinn and Castillo were friends and that Castillo had worked for Guinn, too. Miller admitted that he and Guinn had talked some about the case.

The prosecutor asked, "So, when she told you that Mr. Castillo had confessed to her—" Defense counsel objected. Objections were, for the moment, overruled. The prosecutor resumed, "So, Mr. Miller, are you aware that Ms. Guinn has indicated to law enforcement that Mr. Castillo confessed—" The defense again objected. Defense counsel observed that the prosecution was asking about hearsay that was not in evidence, might never come into evidence, and might mischaracterize what Guinn would testify she had said. The circuit court sustained the objection. It instructed the jury to disregard the question and any answer.

Castillo testified after Miller. The prosecution established in cross-examination of Castillo that he was friendly with Guinn. The prosecutor asked, "Okay. Are you aware that your friend Ms. Guinn, has told the police—"

4

The defense objected to hearsay. This exchange followed:

PROSECUTION: Judge, I can ask him if he's aware of something that's in the police report that she said about him.

THE COURT: That is not in evidence. It is not in evidence before this Court at the present time.

PROSECUTION: Okay. That's fine. I will call her.

The prosecution returned to the well. Protracted arguments about what the prosecution could or could not ask about Guinn's statement followed. The court noted that the prosecution had made no foundation that Castillo knew what Guinn had said, and that Guinn's statement itself was not in evidence. It sustained the objection.

Finally, the prosecution called Guinn to testify in rebuttal. Direct examination had aspects of the game "Telephone." We take it that Guinn had given a statement to police about recorded phone calls between her and another person. Only the part of the statement the prosecution asked Guinn to read is in the record, however. The evidentiary "nut" was that Guinn had said Castillo told her that he had touched the victim inappropriately and felt bad about it.[1]

That was not borne out in her testimony. Guinn, the State's only rebuttal witness, testified that Castillo and his wife talked to her the day the victim made her allegations. She denied Castillo had admitted touching the victim, inappropriately or otherwise. She also said Castillo had told her he felt bad *about the allegations*, not his conduct.

---

[1]It isn't clear how many layers of interpretation and hearsay separated Castillo's statements to Guinn from the parts of the police statement she read into the record. By this we mean it isn't clear whether Guinn was reading her own words from the recorded calls, someone's characterization of those words, an officer's account of statements she made directly, or something else.

5

As the final part of the State's rebuttal closing argument, the prosecutor said:

> The other thing I want you to think about is this; you heard me ask witnesses over and over and over, again, all day long, about Ms. Guinn, remember? How many times did I try to do that and how many times because he is paid. He's not here because he [is] trying to do the right thing. He's being paid, Mr. Proctor. He is doing a good job representing his client. But he did not want you to hear what Ms. Guinn said. Remember that? And finally we got it in. And she read you the statement—

Defense counsel objected, and moved for mistrial, because the prosecutor had improperly disparaged him and focused on the objections to Guinn's testimony. The court denied the mistrial motion. Defense counsel did not ask for an admonition, and none was given.

The prosecutorial comment about defense counsel was sophomoric and objectionable. Our supreme court has held that a defendant is prejudiced, and mistrial is appropriate, if the prosecution "call[s] a witness to the stand when it is already known that the witness cannot give valid relevant testimony and then argue[s] to the jury that it was the appellant who prevented the jury from hearing the evidence." *Timmons v. State*, 286 Ark. 42, 43, 688 S.W.2d 944, 944 (1985). And a prosecutor "should not be tempted to appeal to prejudices, pervert testimony, or make statements to the jury which, whether true or not, have not been proved." *Hall v. State*, 2018 Ark. App. 474, at 5, 561 S.W.3d 333, 336. When a prosecutor deliberately employs unfair tactics, they are more likely to prejudice the defendant late in the trial. *See Honey v. State*, 2018 Ark. App. 217, at 6–7, 547 S.W.3d 483, 487.

Here, the objectionable statement about defense counsel could not have come later. A "closing" is called that for good reason, and this was the *rebuttal* closing at that. In essence, the prosecuting attorney repeatedly injected the "fact" that Castillo had confessed to Guinn

by vaulting over foundational questions that might have stopped the inquiry short. Then, *again* at the end, he cited defense counsel's appropriate objections to attack counsel personally and highlight a "confession" Guinn herself swore Castillo never made. Of course, we reject the suggestion that defense counsel cannot be "trying to do the right thing" in a proceeding because "[h]e's being paid[.]" And the State seems to have stepped right up to the point of no return. The circuit court, however, did not think the State crossed the line. We cannot say the court abused its discretion, all things considered.

The bottom line is that Castillo suffered no prejudice we can see; the jury's verdict demonstrates this. The parts of Guinn's police statement the State introduced—and argued the defense had tried to hide from the jury—established that any "confession" Castillo had made involved an incident that happened "the weekend that [his wife] Issy was gone." Martinez had left the children with Castillo during a trip to Georgia. One count that went to the jury involved an incident of abuse that was alleged to have happened then. However, the jury acquitted Castillo of both charges for that incident.

Affirmed.

GLADWIN and WOOD, JJ., agree.

*Willard Proctor, Jr., P.A.*, by: *Willard Proctor, Jr.*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Christopher R. Warthen*, Ass't Att'y Gen., for appellee.